# In the United States Court of Federal Claims

No. 09-798C

Filed: November 23, 2010

**TO BE PUBLISHED**

*****************************************

LAWNDALE RESTORATION LIMITED
PARTNERSHIP, by and through its
general partner, BOULEVARD
REALTY SERVICES CORPORATION,

    Plaintiff,

v.

THE UNITED STATES,

    Defendant.

*****************************************

Breach of Contract;
Default, 24 C.F.R. §§ 207.255(a)(1), 207.255(c);
Failure to State a Claim, RCFC 12(b)(6);
Illinois Housing Development Act, 20 Ill. Comp.
   Stat. Ann. 3805/1 – 3805/34;
Jurisdiction, 28 U.S.C. § 1491;
Limited Partnership, 805 Ill. Comp. Stat. Ann.
   215/803(a), (b)(1);
Motion to Dismiss, RCFC 12(b)(1), (b)(6);
Multifamily Assisted Housing Reform and
   Affordability Act of 1997, 42 U.S.C. § 1437f
   note;
Multifamily Mortgage Foreclosure Act of 1981, 12
   U.S.C. §§ 3701-3717;
National Housing Act, 12 U.S.C. §§ 1701-1750jj;
Promissory Estoppel;
RCFC 12(d) (matters outside pleadings);
Statute of Limitations, 28 U.S.C. § 2501;
Summary Judgment, RCFC 56;
Takings Clause of the United States Constitution,
   UNITED STATES CONSTITUTION amend. V.

**Thomas E. Patterson, Christine Anne Giovannelli**, The Patterson Law Firm, LLP, Chicago, Illinois, Counsel for Plaintiff.

**Scott A. MacGriff**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

I.     **RELEVANT FACTS.**[1]

In 1974, the Department of Housing and Urban Development ("HUD") authorized Restoration Investors, L.P. ("Restoration Investors"), through its general partner Pyramidwest Realty and Management, Inc. ("Pyramidwest"), to manage a number of apartments for lower-income families that were owned by HUD in Chicago. Compl. ¶ 19. Restoration Investors and Pyramidwest successfully managed these properties until 1980. *Id*.

In 1980, Restoration Investors purchased the apartments that it previously managed, together with an additional 308 apartments located nearby. Compl. ¶ 23. As a result, Restoration Investors became the owner of 1240 apartments located in approximately 100 buildings in the South Side of Chicago ("the South Side Properties"). *Id*. ¶¶ 1, 23.

Between 1979 and 1981, Restoration Investors entered into five Housing Assistance Payment Contracts with HUD, pursuant to the National Housing Act, 12 U.S.C. §§ 1701-1750jj. ("NHA") (hereinafter, "the HAP Contracts").[2] The HAP Contracts required that Restoration Investors provide "Decent, Safe, and Sanitary housing" to lower-income families in the South Side Properties. Gov't Ex. A9. In return, HUD agreed to make "housing assistance payment[s] [to Restoration Investors to] cover the difference between the Contract Rent and that portion of said rent payable by the [lower-income tenant family] as determined in accordance with the Government-established schedules and criteria." Gov't Ex. A11.

On October 5, 1994, in anticipation of the acquisition of the South Side Properties, Lawndale Restoration Limited Partnership ("Lawndale Restoration")[3] entered into Trust No. 11886009 ("the Trust Agreement") with American National Bank and Trust Company of Chicago ("ANBT Chicago"). Gov't Ex. A581. The Trust Agreement, as amended on January 30, 1995, provided that ANBT Chicago would take and hold title to the South Side Properties, as Trustee, for the benefit of Lawndale Restoration. Gov't Ex. A583. Under the Trust Agreement, Lawndale Restoration was entitled to all earnings, rents, and proceeds from the South Side Properties, but was responsible for the management and control thereof. *Id*.

---

[1] The relevant facts were derived from: the November 19, 2009 Complaint ("Compl."); Exhibits to Defendant's ("Government") May 3, 2010 Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment ("Gov't Ex. A1-A1034"); Exhibits to Plaintiff's August 2, 2010 Response ("Pl. Ex. B1-6"); and the Government's August 19, 2010 Reply Exhibits ("Gov't Ex. A1035-A1141").

[2] The HAP Contracts were numbered: IL06-E000-011, IL06-E000-012, IL06-E000-013, IL06-E000-014, and IL06-E000-015. Gov't Ex. A8, A147, A186, A662, A878.

[3] Boulevard Realty Services Corporation ("Boulevard Realty") was the general partner of Lawndale Restoration. Compl. ¶ 3. Mr. Cecil Butler is the President of both Pyramidwest and Boulevard Realty. Gov't Ex. A3.

On January 1, 1995, Lawndale Restoration and ANBT Chicago entered into a loan agreement with the Illinois Housing Development Authority ("IHDA"),[4] whereby Lawndale Restoration and ANBT Chicago would receive a $50,750,000 loan to restructure the outstanding debt on the South Side Properties.  Gov't Ex. A372.  The IHDA financed this loan through the issuance of bonds by First National Bank of Chicago, pursuant to the Illinois Housing Development Act, 20 Ill. Comp. Stat. Ann. 3805/1 – 3805/34.  Gov't Ex. A278.

On February 1, 1995, Restoration Investors transferred the ownership of the South Side Properties and assigned the HAP Contacts to Lawndale Restoration.  Gov't Ex. A1, A60, A111, A176, A234.  On that same date, IHDA and ANBT Chicago executed a mortgage on the South Side Properties in the amount of $47,089,800 to secure the January 1, 1995 loan.  Gov't Ex. A269, A274.  In addition, on that same date, HUD entered into a Regulatory Agreement for Multifamily Housing Projects ("2/1/95 Regulatory Agreement") with Lawndale Restoration and ANBT Chicago, pursuant to Section 221(d)(4) of the NHA.[5]  Gov't Ex. A260, A554.  The February 1, 1995 Regulatory Agreement required Lawndale Restoration to comply with HUD rules and regulations as "consideration [for] the endorsement for insurance by the Secretary [of HUD] of the [February 1, 1995 mortgage note.]"  *Id.*  The 2/1/95 Regulatory Agreement was incorporated into the terms of the mortgage by reference.  Gov't Ex. A270.

On February 6, 1995, IHDA entered into a mortgage insurance agreement with HUD, pursuant to Section 221(d)(4) of the NHA and the 2/1/95 Regulatory Agreement, under which HUD served as the guarantor of Lawndale Restoration's February 1, 1995 mortgage.  Gov't Ex. A563.

---

[4] The Illinois Housing Development Authority "finances the creation and the preservation of affordable housing throughout the state and increases the supply of decent and safe places for people of low or moderate means to live. . . .  IHDA does not own property, rent apartments or manage buildings.  [IHDA is] strictly a financing entity, and help[s] to finance affordable housing through homeownership programs targeted at low- or moderate-income households, or with multifamily development financing to help developers build rental properties for at-need populations."  Illinois Housing Development Authority, http://www.ihda.org (last visited November 22, 2010).

[5] Section 221(d)(4) of the NHA provides, in relevant part:

> [T]he Secretary [of HUD] may, in his discretion, require the mortgagor to be regulated or restricted as to rents or sales, charges, capital structure, rate of return, and methods of operation. . . .

12 U.S.C. § 1715*l*(d)(4)(iv).

The following chart, prepared by the court, shows the previously described transactions, the order thereof, and the relationships between and among the parties, as of February 6, 1995:

**COURT EXHIBIT**



On September 16, 1999, after several renewals, the HAP Contracts were consolidated into a single HAP Contract, effective as of October 1, 1999 ("Consolidated HAP Contract").[6] Gov't Ex. A939-40.

On October 6, 2000, Lawndale Restoration renewed the Consolidated HAP Contract for another one-year term, with three automatic one-year renewals. Gov't Ex. A946.

By at least mid-2003, as a result of escalating expenses and the need to rehabilitate several of the South Side Properties units, Lawndale Restoration began to experience financial

---

[6] The Consolidated HAP Contract was numbered IL-E000-105.

difficulties. Compl. ¶ 36. In the fall of 2003, Mr. Cecil Butler, President of Boulevard Realty, the general partner of Lawndale Restoration, met with Mr. Edward Hinsberger, the Multifamily Hub Manager in HUD's Chicago Multifamily Hub Office to discuss Lawndale Restoration's financial situation. Pl. Ex. B1 ¶ 2 (8/2/10 Butler Aff.). Mr. Butler explained that there was an urgent need to refinance the February 1, 1995 mortgage on the South Side Properties to reduce Lawndale Restoration's mortgage payments so that funds could be available to make capital repairs. Compl. ¶ 62. In support, Mr. Butler provided Mr. Hinsberger with Lawndale Restoration's "financial records, an analysis of its operating costs, annual deficit, and its estimated capital or repair costs." Pl. Ex. B1 ¶ 4 (8/2/10 Butler Aff.). The governing documents, however, prevented Lawndale Restoration from refinancing prior to December 1, 2005 without HUD approval. Gov't Ex. A276, A308.[7]

On October 2, 2003, Mr. Hinsberger sent a memorandum to Ms. Beverly Miller, Director of HUD's Office of Asset Management, requesting that she override the refinancing prohibition in the mortgage note and bond indenture, since a default by Lawndale Restoration appeared imminent. Pl. Ex. B3.

On December 19, 2003, HUD sent a letter to Lawndale Restoration informing the company that it was in default on the February 1, 1995 mortgage,[8] and of the consequences of a default. Gov't Ex. A480. HUD sent the same notice to Lawndale Restoration on five subsequent occasions: January 14, 2004 (Gov't Ex. A482); April 7, 2004 (Gov't Ex. A484); June 24, 2004 (Gov't Ex. A486); July 16, 2004 (Gov't Ex. A488); and August 23, 2004 (Gov't Ex. A490).

On January 13, 2004, Ms. Miller denied Mr. Hinsberger's request to authorize the refinancing of Lawndale Restoration's February 1, 1995 mortgage. Pl. Ex. B4. On February 9, 2004, Mr. Hinsberger requested reconsideration. Pl. Ex. B4. Ms. Miller, again, declined to authorize refinancing. Gov't Ex. A440. On July 7, 2004, Mr. Hinsberger appealed to Mr. Stillman Knight, HUD's Deputy Assistant Secretary for Multifamily Housing, arguing that, because of a recent porch collapse that killed thirteen people, the City of Chicago would be inspecting all porches in the city to ensure compliance with the new building code. Pl. Ex. B5.

---

[7] Mr. Butler contends that, at some point in the fall of 2003, Mr. Hinsberger "strongly recommended . . . that [Lawndale Restoration] use its funds reserved for mortgage payments to pay for the capital costs needed to fund the [required repairs]." Pl. Ex. B1 ¶ 6 (8/2/10 Butler Aff.). Mr. Hinsberger also allegedly told Mr. Butler that HUD would work to ensure that the February 1, 1995 mortgage would not be subject to foreclosure, even though Lawndale Restoration would not be making mortgage payments. Pl. Ex. B1 ¶ 6 (8/2/10 Butler Aff.).

Mr. Hinsberger agrees that he became aware that Lawndale Restoration was interested in refinancing the February 1, 1995 mortgage in the fall of 2003. Gov't Ex. A439. Mr. Hinsberger, however, denies advising Mr. Butler that Lawndale should stop making its mortgage payments on the South Side Properties. Gov't Ex. A441 (4/29/10 Hinsberger Dec.).

[8] HUD regulations provide: "The following shall be considered a default under the terms of a mortgage insured under this subpart . . . [f]ailure of the mortgagor to make any payment due under the mortgage." 24 C.F.R. § 207.255(a)(1).

Since most of the South Side Properties were three-story buildings with wooden porches, renovations would be required to meet the new building code, further exacerbating Lawndale Restoration's existing financial difficulties. *Id.*

On July 1, 2004, Lawndale Restoration made a final mortgage payment to IHDA. Gov't Ex. A496. On August 23, 2004, HUD sent a final notice of default to Lawndale Restoration. Gov't Ex. A490. Nevertheless, on September 9, 2004, HUD conditionally approved Lawndale Restoration's request to refinance, if the following conditions were met:

> The owner [sic] must provide evidence that the bondholders have been approached and have declined to reduce the bond rate.
>
> Upon refinancing of the debt, the owners will earn no developer's fee.
>
> Upon refinancing of the debt, any proceeds of the sale will be applied to addressing the porches and any other physical needs; any outstanding project payables; and any remaining funds will be placed in the Reserve for Replacement Account. [HUD] will not permit any equity to be taken out of the refinancing of the debt.

Gov't Ex. A1038.

In light of this, on September 16, 2004, Mr. Butler wrote a letter to Kelly Dibble, Executive Director of IHDA, requesting that the bondholders reduce the bond rate. Gov't Ex. A479.

On September 22, 2004, Lawndale Restoration renewed the Consolidated HAP Contract for another five year period. Gov't Ex. A961.

On October 15, 2004, however, IHDA submitted a Default Election to HUD, electing its option to assign the February 1, 1995 mortgage to HUD and collect on the February 6, 1995 Mortgage Insurance Agreement.[9] Gov't Ex. A492, A496. As a result, the pending request by Mr. Butler to reduce the bond rate was rendered moot. Gov't Ex. A492, A496.

On November 17, 2004, IHDA assigned the mortgage to HUD and recorded the assignment, obligating HUD to pay IHDA $45,247,034.84, pursuant to the February 6, 1995 Mortgage Insurance Agreement. Gov't Ex. A497. On November 18, 2004, HUD made an Electronic Funds Transfer ("EFT") of $41,406,687.14 to IHDA. Gov't Ex. A1056.[10]

---

[9] HUD regulations state: "If such defaults as defined in . . . this section continue for a period of 30 days the mortgagee shall be entitled to receive the benefits of the insurance. . . ." 24 C.F.R. § 207.255(c).

[10] On February 7, 2005, HUD made an additional EFT of $3,840,347.70 to IHDA. Gov't Ex. A1057.

On December 23, 2004, HUD sent a letter to inform Lawndale Restoration that "HUD will put this mortgage into foreclosure immediately after the assignment has been completed." Gov't Ex. A498. To avoid foreclosure, Lawndale Restoration either would have to pay all mortgage payments then due, or submit a reinstatement plan "designed to bring the mortgage current and enable the resumption of full amortization within 12 months of the assignment." *Id.*

On December 29, 2004, HUD sent another letter to inform Lawndale Restoration that the entire principal balance of the mortgage was due and payable. Gov't Ex. A500. Before convening a foreclosure sale of the South Side Properties, HUD gave Lawndale Restoration twenty-one days to submit a written statement "show[ing] legal reasons why foreclosure should not take place." *Id.* Lawndale Restoration requested an immediate meeting with Alvin Braggs, Director of HUD's Property Disposition Center. Gov't Ex. A506.

On January 28, 2005, Lawndale Restoration's counsel initiated a telephone conference with Mr. Braggs to discuss why HUD should not proceed with the foreclosure sale. Gov't Ex. A502, A506. On February 4, 2005, Lawndale Restoration's counsel followed up with a letter that set forth the legal reasons why HUD should not proceed with a foreclosure sale. Gov't Ex. A502. On March 1, 2005, Lawndale Restoration was informed that HUD decided to proceed with the foreclosure sale. Gov't Ex. A506, A508.

The foreclosure sale, however, was delayed, because on May 23, 2005, four residents of the South Side Properties and the Association of Community Organizers for Reform Now ("ACORN") filed a Complaint in the United States District Court for the Northern District of Illinois "seeking a preliminary injunction to halt the foreclosure [on the South Side Properties]." *ACORN, et al.* v. *Department of Housing and Urban Development*, No. 05-3049, 2005 U.S. Dist. Lexis 45970, *1-2 (N.D. Ill. Oct. 5, 2005). On July 11, 2005, the Government filed a Motion To Dismiss. On October 5, 2005, the United States District Court for the Northern District of Illinois granted the Government's motion. *Id.* at *29. ACORN and the residents of the Properties filed a Notice of Appeal on October 31, 2005. *ACORN, et al.* v. *Department of Housing and Urban Development*, 05-3049 (N.D. Ill. Oct. 31, 2005). On January 13, 2006, however, ACORN and the residents of the South Side Properties voluntarily withdrew their Complaint, rendering the appeal moot. Plaintiffs' Notice of Voluntary Dismissal Without Prejudice, Pursuant to Fed. R. Civ. P. 41(a)(1), *ACORN, et al.* v. *Department of Housing and Urban Development*, No. 05-3049 (N.D. Ill. Jan. 13, 2006).

On January 17, 2006, a foreclosure sale of the South Side Properties was held, pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. §§ 3701-3717. Gov't Ex. A526. HUD submitted the highest bid, in the amount of $50,674,167.82. *Id.* After the foreclosure sale, HUD conveyed title to the City of Chicago, that subsequently sold the South Side Properties to the Community Investment Corporation.[11] Compl. ¶ 59.

---

[11] Community Investment Corporation "is a not-for-profit mortgage lender that provides financing to buy and rehab multifamily apartment buildings with five units or more in the six-county metropolitan Chicago area." Community Investment Corporation, http://www. cicchicago.com (last visited November 22, 2010).

On June 16, 2008, Lawndale Restoration was dissolved. Gov't Ex. A597.

## II. PROCEDURAL HISTORY.

On November 19, 2009, Boulevard Realty, the general partner of Lawndale Restoration, filed a Complaint in the United States Court of Federal Claims alleging three causes of action.

Count I alleges a breach of "the HAP Contract, the Financing/Insurance Agreements,[12] and the implied duty of good faith and fair dealing," because of HUD's failure "to provide Lawndale Restoration with adequate funds to manage the [South Side] [P]roperties and make capital improvements." Compl. ¶ 61; *see also id*. ¶¶ 60-66. Count II alleges that HUD's foreclosure and transfer of Lawndale Restoration's interest the South Side Properties to the City of Chicago and subsequent transfer to the Community Investment Corporation was an unconstitutional taking of Lawndale Restoration's property, without Just Compensation. Compl. ¶¶ 67-74. Count III alleges that Lawndale Restoration relied on HUD's promise to provide adequate funds to enable Lawndale Restoration to operate and rehabilitate the South Side Properties to its detriment, since those funds were not provided and caused the subsequent non-judicial foreclosure sale thereof without notice. Compl. ¶¶ 75-80.

On May 3, 2010, the Government filed a Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment ("Gov't Mot."). On May 28, 2010, Plaintiff filed an Unopposed Motion For Enlargement Of Time To Respond, in order to conduct depositions and written discovery to respond to the Government's May 3, 2010 Motion. On June 2, 2010, the court issued an Order granting Plaintiff's May 28, 2010 Enlargement Motion.

On June 8, 2010, the Government requested that the court clarify whether the June 2, 2010 Order solely permitted Plaintiff more time to respond to the Government's May 3, 2010 Motion to Dismiss or whether the Order also authorized Plaintiff to conduct discovery prior to responding to the Government's May 3, 2010 Motion To Dismiss. The Government argued that it only consented to the Enlargement Motion for the purpose of giving Plaintiff additional time to respond and did not consent to afford Plaintiff discovery. The Government also argued that discovery was unnecessary in light of the fact that HUD produced 9,395 pages of documents in response to a Freedom of Information Act request filed by Plaintiff prior to this litigation.

On June 14, 2010, the court convened a telephone status conference to resolve the Government's June 8, 2010 request. After considering the positions of the parties, the court

---

[12] The November 19, 2009 Complaint refers to all of the "documents providing financing and FHA Mortgage Insurance" collectively as the "Financing/Insurance Agreements." Compl. ¶ 40; *see also* Gov't Ex. A241-A431. The Financing/Insurance Agreements include the following documents: the 9/21/04 Notification of Funds Reserved for the Consolidated HAP Contract (Gov't Ex. A241); the 9/22/04 Renewal of the Consolidated HAP Contract (Gov't Ex. A244); the 2/1/95 Regulatory Agreement (Gov't Ex. A260); the 2/1/95 Mortgage (Gov't Ex. A269) and Mortgage Note (Gov't Ex. A274) between ANBT Chicago and IHDA; the Bond Indenture of Trust between IHDA and First National Bank of Chicago (Gov't Ex. A278); and the January 1, 1995 Loan Agreement between IHDA, Lawndale and ANBT Chicago (Gov't Ex. A372).

determined that additional discovery was not necessary for the court to resolve the Government's May 3, 2010 Motion to Dismiss.  6/14/10 TR at 9-10.

On August 2, 2010, Plaintiff submitted a Response to the Government's May 3, 2010 Motion To Dismiss, Or In The Alternative, For Summary Judgment ("Pl. Resp.").  On August 19, 2010, the Government filed a Reply ("Gov't Reply").

### III.    JURISDICTION.

#### A.    The Court Has Jurisdiction To Adjudicate The Claims Alleged In Counts I And II Of The November 19, 2009 Complaint.

Congress defined the jurisdiction of the United States Court of Federal Claims in the Tucker Act.  *See* 28 U.S.C. § 1491 (2006).  This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  *Id*. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon it whenever the substantive right exists."  *United States* v. *Testan*, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages.  *See Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").  The burden of establishing jurisdiction falls on the plaintiff.  *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

Count I of the November 19, 2009 Complaint alleges that HUD breached: the HAP Contract and Finance/Insurance Agreements; the implied covenant of good faith and fair dealing; and the duty to provide Lawndale Restoration with adequate funds to manage the South Side Properties and make capital improvements.  Compl. ¶¶ 60-66.  The court has jurisdiction to adjudicate the claims alleged in Count I.

In addition, the United States Court of Appeals for the Federal Circuit has held that the Takings Clause of the Fifth Amendment is "money-mandating."  *Schooner Harbor Ventures, Inc.* v. *United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009) ("The Tucker Act waives sovereign immunity and provides jurisdiction for certain types of claims, including . . . where there is a money-mandating provision on which the plaintiff may base its recovery. . . . In this case, that provision is the Fifth Amendment.") (citing *Fisher*, 402 F.3d at 1172); *see also Moden* v. *United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005).  Therefore, "to the extent [Plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."  *Moden*, 404 F.3d at 1341.

Count II alleges a violation of the Takings Clause of the Fifth Amendment to the United States Constitution. Compl. ¶¶ 67-74. The court has jurisdiction to adjudicate the claims alleged in Count II.

### B. The Court Does Not Have Jurisdiction To Adjudicate The Claims Alleged In Count III Of The November 19, 2009 Complaint.

Count III of the November 19, 2009 Complaint alleges that HUD "unambiguously promised to provide adequate funds for Lawndale Restoration to operate and rehabilitate the [South Side] Properties." Compl. ¶ 76; *see also id*. ¶¶ 75-79. The Complaint further alleges that HUD "unambiguously instructed Lawndale Restoration to stop paying [its mortgage] and to use those funds to make repairs on the Properties." *Id*. ¶ 76. HUD "then agreed that it would work with IHDA to ensure that the mortgage would not be foreclosed." *Id*. ¶ 76. Lawndale Restoration avers that it reasonably relied on HUD's "unambiguous promises" to its detriment by stopping payment on the mortgage and using those funds for repairs and rehabilitation of the South Side Properties, which led to the foreclosure. *Id*. ¶¶ 77-79.

The Government argues that the court does not have "jurisdiction to hear promissory estoppel claims." Gov't Mot. at 34. Plaintiff counters that "the United States Supreme Court has not adopted a 'flat rule' that no estoppel will ever lie against the Government under any circumstances." Pl. Resp. at 14. Therefore, "this [c]ourt has found equitable relief to be proper in certain cases." *Id*. In the alternative, if dismissal of this claim is required, Plaintiff requests to "strike the title of Count III, or allow an amendment thereto, and consider the allegations therein as allegations of equitable estoppel or a contract implied-in-fact." *Id*. at 15.

The Government also argues that even if Mr. Hinsberger instructed Lawndale Restoration to stop paying the mortgage, any reliance Lawndale Restoration made was misplaced. Gov't Reply at 13-14. First, "HUD was not a party to the loan and mortgage agreements, and thus Mr. Hinsberger had no authority to modify those third-party agreements to permit non-payment by [Lawndale Restoration]." *Id*. at 14. In addition, "Mr. Hinsberger did not have the authority to promise on behalf of the mortgagee that the mortgage would not be foreclosed." *Id*. Therefore, any reliance by Lawndale Restoration on Mr. Hinsberger's alleged statements was unreasonable, "making application of the doctrine of estoppel inapplicable." *Id*.

The Tucker Act authorizes the United States Court of Federal Clams "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a). In *Hercules Inc.* v. *United States*, 516 U.S. 417 (1996), the United States Supreme Court held that "this jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Id*. at 423. The difference between an agreement implied in fact and one implied in law has been explained in this way:

> An agreement implied in fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. By contrast, an agreement implied in law is a fiction of law

10

> where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.

*Id*. at 424 (internal quotations and citations omitted).

The United States Court of Federal Claims has recognized that "[p]romissory estoppel is another name for an implied-in-law contract claim." *Hubbs* v. *United States*, 20 Cl. Ct. 423, 427 (1990); *see also Steinberg* v. *United States*, 90 Fed. Cl. 435, 443 (2009) ("Promissory estoppel . . . requires the court find an implied-in-law contract, [and therefore the court has no jurisdiction, because such] a claim [is one] for which the United States has not waived its sovereign immunity."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981) (Promissory estoppel involves "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance.").

Since Count III of the November 19, 2009 Complaint alleges a contract implied in law, it must be dismissed for lack of subject matter jurisdiction. *See Hercules, Inc.*, 516 U.S. at 423; *see also* RCFC 12(b)(1).[13] Plaintiff, however, requests leave to amend the November 19, 2009 Complaint to allege a breach of an implied-in-fact contract or equitable estoppel.

In *Hanlin* v. *United States*, 316 F.3d 1325 (Fed. Cir. 2003), the United States Court of Appeals for the Federal Circuit explained the elements of proof required to establish the existence of an implied-in-fact contract, as follows:

> Plaintiff has the burden to prove the existence of an implied-in-fact contract. An implied-in-fact contract with the government requires proof of (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government's representative to bind the government in contract. . . . An implied-in-fact contract is one founded upon the meeting of minds and is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.

*Id*. at 1328 (internal quotations and citations omitted).

Under the 2/1/95 Regulatory Agreement, Lawndale Restoration had a pre-existing duty to "maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto in good repair and condition." Gov't Ex. A555. Since a pre-existing duty cannot constitute consideration for a new contract, Lawndale Restoration's promise to make repairs to the South Side Properties does not constitute consideration for an implied-in-fact contract. In

---

[13] A challenge to the "[United States Court of Federal Claims'] general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter[.]").

addition, the November 19, 2009 Complaint does not allege that Plaintiff offered any other consideration for the alleged HUD promise to ensure that the February 1, 1995 mortgage would not be foreclosed.

Even if such consideration existed, however, Mr. Hinsberger had no actual authority to promise that IHDA would not foreclose on the February 1, 1995 mortgage, since HUD was not a party to the mortgage. Accordingly, any attempt by Plaintiff to claim a breach of an implied-in-fact contract would fail.

Finally, the court repeatedly has held that equitable estoppel is a defensive doctrine, not the basis of a cause of action. *See Gregory* v. *United States*, 37 Fed. Cl. 388, 396 (1997) ("[P]laintiffs invoke the doctrine of estoppel to establish the existence of a contract upon which to base their claims. As our cases make clear, however, plaintiffs cannot be permitted to establish this crucial element of their case on the basis of estoppel."); *see also American Maritime Transport, Inc.* v. *United States*, 18 Cl. Ct. 283, 292 (1989) ("The doctrine of equitable estoppel is referred to as a shield because it is used to bar a party from raising a defense or objection that it otherwise would have, or from instituting an action which it is entitled to institute.") (internal quotation omitted); *Jablon* v. *United States*, 657 F.2d 1064, 1068 (9th Cir. 1981) ("[E]quitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute. Promissory estoppel is a sword, and equitable estoppel is a shield.").

Since a claim by Plaintiff for breach of an implied-in-fact contract or equitable estoppel would necessarily fail, Plaintiff's request for leave to amend the November 19, 2009 Complaint is denied.

### C. The Allegations of Count I Are Not Barred By The Statute Of Limitations.

Section 2501, Title 28, of the United States Code states: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. In *John R. Sand & Gravel Co.* v. *United States,* 552 U.S. 130 (2008), the United States Supreme Court held that 28 U.S.C. § 2501 is jurisdictional and cannot be waived or tolled based on equitable considerations:

> Some statutes of limitations . . . seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as . . . limiting the scope of a governmental waiver of sovereign immunity. The Court has often read the time limits of these statutes as more absolute. . . . [T]he Court has sometimes referred to the time limits in such statutes as 'jurisdictional.' This Court has long interpreted the court of claims limitations statute as setting forth this . . . more absolute, kind of limitations period.

*Id*. at 133-34.

The Government asserts that Count I of the November 19, 2009 Complaint "alleges that the Government breached duties found in the 1995 assignment agreement attached to [P]laintiff's

complaint." Gov't Mot. at 16.[14] The November 19, 2009 Complaint also alleges "that the Government breached duties associated with a 2004 renewal agreement . . . which, by its terms, incorporated a prior renewal agreement dated October 6, 2000." *Id.* Therefore, to the extent that Count I alleges claims "which arose prior to November 19, 2003," those claims are barred by 28 U.S.C. § 2501. *Id.*

The United States Court of Appeals for the Federal Circuit has held that "a claim first accrues when *all* the events have occurred that fix the alleged liability of the [G]overnment and entitle the claimant to institute an action." *Ingrum* v. *United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) (emphasis added) (internal citations omitted).

On March 1, 2005, HUD informed Lawndale Restoration that it planned to proceed with a foreclosure sale of the South Side Properties. Gov't Ex. A506, A508. On January 17, 2006, HUD held the foreclosure sale and took title to the South Side Properties. Gov't Ex. A526. Although Plaintiff may have had financial difficulties prior to the foreclosure sale, Plaintiff was not injured by HUD's alleged breach of contract prior to March 1, 2005. In fact, Plaintiff was not "entitle[d] . . . to institute an action" against the Government until HUD informed Lawndale Restoration of the decision to foreclose on the South Side Properties on March 1, 2005. *See Ingrum*, 560 F.3d at 1314. Therefore, Plaintiff's breach of contract claims, as alleged in Count I of the November 19, 2009 Complaint did not accrue until March 1, 2005.

Accordingly, the court has determined that the claims alleged in Count I of the November 19, 2009 Complaint are not barred by 28 U.S.C. § 2501.

**D. Standing.**

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Specifically, to establish standing, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl, Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

In this case, the November 19, 2009 Complaint alleges that Lawndale Restoration suffered an injury in fact, that is traceable to Lawndale Restoration's loss of the South Side Properties, resulting in economic injury that can be determined in a specific amount that is sufficient to establish standing. Compl. ¶¶ 60-74. Lawndale Restoration, however, was dissolved on June 16, 2008. Compl. ¶¶ 2-3; *see also* Gov't Ex. A597.

---

[14] The Government does not challenge the timeliness of the allegations set forth in Count II.

13

The November 19, 2009 Complaint does not allege that Boulevard Realty suffered any injury, although it was Lawndale Restoration's general partner. *Id*. Under Illinois law, however, a limited partnership like Lawndale Restoration may continue "after dissolution only for the purpose of winding up its activities." 805 Ill. Comp. Stat. Ann. 215/803(a). To wind up activities, a limited partnership may "prosecute and defend actions and proceedings, whether civil, criminal, or administrative, transfer the limited partnership's property, settle disputes by mediation or arbitration . . . and perform other necessary acts." 805 Ill. Comp. Stat. Ann. 215/803(b)(1). Therefore, under Illinois law, Boulevard Realty has standing to initiate this action as part of Lawndale Restoration's "winding up" activities.

## IV. DISCUSSION

### A. Count I For Breach Of Contract.

Count I of the November 19, 2009 Complaint alleges that "[u]nder the HAP Contract, Financing/Insurance Agreements, and the implied duty of good faith and fair dealing, [HUD] had the duty to provide Lawndale Restoration with adequate funds to manage the [South Side P]roperties and make capital improvements." Compl. ¶ 61. The Complaint further alleges that HUD breached this duty by not providing adequate funds to manage the properties and make necessary renovations; refusing to allow Lawndale Restoration to refinance the February 1, 1995 mortgage; and instructing Lawndale Restoration to stop making payments on the February 1, 1995 mortgage but then foreclosing on the South Side Properties. *Id*. ¶¶ 62-63.

#### 1. Count I Fails To Allege Facts Sufficient To Establish A Breach Of Any Contract To Which Defendant Was A Party.

As a threshold matter, the January 1, 1995 Bond Indenture of Trust between IHDA and First National Bank of Chicago (Gov't Ex. A278), and the February 1, 1995 Mortgage (Gov't Ex. A269) and Note (Gov't Ex. A274) were agreements to which HUD was not a party. Therefore, HUD owes no duties to Plaintiff based on these "Financing/Insurance Agreements," and all allegations in Count I based on the agreements to which HUD was not a party are dismissed for failure to state a claim on which relief may be granted. *See* RCFC 12(b)(6).[15]

---

[15] Although a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). In order to survive a motion to dismiss, however, the court "[does] not requir[e] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570; *see also Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

14

### 2. Count I Fails To Allege Facts Sufficient Otherwise To Establish A Breach Of Contact.

As for the Consolidated HAP Contract and Financing/Insurance Agreements to which HUD was a party (Gov't Ex. A241, A244, A260), none impose any duty on HUD to provide Lawndale Restoration with additional funds to manage or for capital improvements on the South Side Properties, beyond the housing assistance payments. Although Plaintiff cites to pages 1-2 of the assignment of the HAP Contracts (Gov't Ex. A1-2), and pages 12-15 of the Consolidated HAP Contract (Gov't Ex. A252-55), neither of these documents supports the allegations in Count I of the November 19, 2009 Complaint. Compl. ¶ 61. Paragraph 9 of the Consolidated HAP Contract states that the contract "shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations." Gov't Ex. A255. This clause, however, does not place any affirmative duty on HUD to provide any funds for management or rehabilitation.

In the alternative, Plaintiff argues that under the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), codified at 42 U.S.C. § 1437f note, "HUD had a duty to provide funds to manage and rehabilitate the properties as well as a duty to work out a debt restructuring transaction to lower Lawndale Restoration's interest rate and free up more funds for the project[,] because the funds provided by HUD alone were insufficient to maintain and rehabilitate the properties." Pl. Resp. at 9.

Specifically, Plaintiff argues that HUD's duty arose under Section 517(c)(1) of MAHRA, which provides:

> Rehabilitation may be paid from the residual receipts, replacement reserves, or any other project accounts not required for project operations, or, as provided in appropriations Acts and subject to the control of the Secretary of applicable accounts in the Treasury of the United States, from budget authority provided for increases in the budget authority for assistance contracts under section 8 of the United States Housing Act of 1937 . . . or through the debt restructuring transaction.

MAHRA § 517(c)(1).

The court has determined that MAHRA has no relevance to this case. First, Section 514(h)(1) of MAHRA[16] exempts state government projects insured by HUD from utilizing a

---

[16] Section 514(h)(1) of MAHRA provides:

The following categories of *projects shall not be covered* by a mortgage restructuring and rental assistance sufficiency plan *if . . . the primary financing or mortgage insurance* for the multifamily housing project that is covered by that expiring contract *was provided by a unit of State government* or a unit of general local government (or an agency or instrumentality of a unit of a State government or unit of general local government) *and the financing involves mortgage insurance under the National Housing Act*, such that the implementation of a

15

mortgage restructuring plan. Since the mortgage at issue was held by IHDA, a state government entity, and was insured under the National Housing Act by HUD, Section 517(c) of MAHRA is not applicable.

Second, Section 517(c) of MAHRA, "Restructuring Tools," sets forth how a "mortgage restructuring and rental assistance sufficiency plan for [a] eligible multifamily housing project" is to be implemented. *See* MAHRA § 514(a)(1) ("The Secretary shall develop procedures and requirements for the submission of a mortgage restructuring and rental assistance sufficiency plan for each eligible multifamily housing project with an expiring contract."). To qualify as an eligible multifamily housing project, a project must generate "rents that, on an average per unit or per room basis, exceed the rent of comparable properties in the same market area." MAHRA § 512(2)(A). The June 2004 rent comparability market study conducted by Lawndale Restoration, however, shows that the South Side Properties had, on average, below market rents. Gov't Ex. A1080. Therefore, Lawndale Restoration was not eligible for mortgage restructuring under MAHRA § 517(c).

Third, even if Section 517(c) of MAHRA did apply to Lawndale Restoration, that Section does not place any affirmative duty on HUD to provide management or rehabilitation funds. Section 517(c)(1), in relevant part, provides:

> Rehabilitation *may be paid* from the residual receipts, replacement reserves, or any other project accounts not required for project operations, or . . . from budget authority provided for increases in the budget authority for assistance contracts under section 8 of the United States Housing Act of 1937.

MAHRA § 517(c)(1) (emphasis added). Therefore, this section simply lists potential sources from which funding for rehabilitation *may* be paid. It does not mandate that any funds *must* be paid for this purpose.

For these reasons, the court has determined that the claims in Count I alleging that HUD failed to provide Lawndale Restoration with funds for management or capital improvements fail to state a claim upon which relief may be granted. *See* RCFC 12(b)(6).[17]

### 3. Count I Fails To Allege Facts Sufficient To Establish A Duty To Refinance.

The November 19, 2009 Complaint also alleges that HUD had a duty to approve Lawndale Restoration's request to refinance the mortgage on the South Side Properties, but refused to do so. Compl. ¶ 62. For the reasons stated above, HUD had no duty to approve

---

> mortgage restructuring and rental assistance sufficiency plan under this subtitle is in conflict with applicable law or agreements governing such financing.

MAHRA § 514(h)(1) (emphasis added).

[17] *See infra* note 15.

Lawndale Restoration's request to refinance its mortgage. *See* Gov't Ex. A241, A244, A260. Assuming *arguendo* that HUD had such a duty, both parties proffered substantial evidence establishing that HUD employees in Chicago worked diligently to secure approval for Lawndale Restoration's refinance and that Lawndale Restoration was aware that this request conditionally was approved. Pl. Ex. B1 (8/2/10 Butler Aff.), B3-B5; Gov't Ex. A439-40, A479, A1038.

Accordingly, the court has determined that the Government is entitled to summary judgment with respect to Plaintiff's claim that HUD breached its contractual duty refinance the South Side Properties. *See* RCFC 12(d),[18] 56(c).

### 4. Count I Fails To Allege Facts Sufficient To Establish A Breach Of The Duty Of Good Faith And Fair Dealing.

The November 19, 2009 Complaint alleges that Mr. Hinsberger "instructed [Mr.] Butler as President of Boulevard, to stop payment of the [m]ortgage and to use the funds previously used to pay the [m]ortgage to make some needed capital improvements and pay the accelerating operating costs." Compl. ¶ 56. Mr. Hinsberger, however, denies instructing Lawndale Restoration stop making mortgage payments. Gov't Ex. A441-42, A1036.

Although the nature of Mr. Hinsberger's statements and whether they were actually made are disputed factual issues, they are not material to the resolution of this claim. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted[.]"); *see also* RCFC 56(c). At the time of Mr. Hinsberger's alleged statement, HUD was not a party to the mortgage, mortgage note, or loan agreement between Lawndale Restoration, ANBT Chicago and IHDA. Since HUD was not a party to these agreements, it had no express contractual duties thereunder. Therefore, as a matter of law, HUD had no implied duty of good faith and fair dealing. *See Precision Pine & Timber, Inc.* v. *United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) ("The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.").

Accordingly, the court has determined that the Government is entitled to summary judgment with respect to Plaintiff's claim that the Government breached the duty of good faith and fair dealing. *See* RCFC 12(d), 56(c).

### B. Count II For Taking Without Just Compensation.

The November 19, 2009 Complaint alleges that Lawndale Restoration's interest in the South Side Properties was "taken for either private use or public use, in violation of the Fifth Amendment to the United States Constitution," when the mortgage was foreclosed and HUD

---

[18] RCFC 12(d) states: "If, on a motion under RCFC 12(b)(6) . . . matters *outside the pleadings* are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56." RCFC 12(d) (emphasis added).

subsequently purchased and transferred the South Side Properties to the City of Chicago. Compl. ¶¶ 69-70. The November 19, 2009 Complaint further alleges that HUD has "failed and refused . . . to pay Plaintiff just compensation for the taking of its property rights." *Id.* ¶ 71.

The Government argues that since Lawndale Restoration "did not have legal title to [the South Side Properties] prior to the foreclosure, [Plaintiff has] failed to state a claim upon which relief can be granted." Gov't Mot. at 29. The record establishes that ANBT Chicago, as trustee, held legal title to the Properties. *Id.* at 33. Lawndale Restoration "held nothing more than a mere beneficial interest in the trust." *Id.* The October 5, 1994 Trust Agreement states "that no beneficiary now has, and that no beneficiary hereunder at any time shall have any right, title or interest in or to any portion of said real estate as such, either legal or equitable, but only an interest in the earnings, avails and proceeds." Gov't Ex. A583. In addition, the Government argues that HUD "did not effectuate a [taking,] pursuant to the Fifth Amendment, but rather, exercised contractual remedies which arose because of [Lawndale Restoration's] default on its mortgage obligations." Gov't Mot. at 32.

Plaintiff responds that, as the sole beneficiary of the trust, Lawndale Restoration "has a valid property interest and standing to bring an unlawful takings claim." Pl. Resp. at 12. In addition, the Trust Agreement states that the "Trustee shall have no duty in respect to . . . litigation[.]" Gov't Ex. A586-87. Therefore, it is Lawndale Restoration's responsibility to conduct any litigation with respect to the South Side Properties. Pl. Resp. at 13.

Plaintiff further argues that the January 17, 2006 deed produced by the Government (Gov't Ex. A526) is not sufficient evidence that HUD made a compensatory payment to Lawndale Restoration for the South Side Properties. Pl. Resp. at 25. Therefore, Plaintiff reasons that, even if the court determines that the January 17, 2006 deed is sufficient evidence of compensation, there remains a "genuine issue of material fact as to whether this payment constitutes just compensation under the Fifth Amendment of the U.S. Constitution." *Id.*

The United States Court of Appeals for the Federal Circuit, however, has held that "[i]n general, takings claims do not arise under a government contract because . . . the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract." *St. Christopher Associates, L.P.* v. *United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008); *see also Hughes Communications Galaxy, Inc.* v. *United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.") (internal citations omitted); *Sun Oil Co.* v. *United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) ("[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.") (internal citation omitted).

On November 17, 2004, IHDA assigned the mortgage to HUD, pursuant to the mortgage insurance contract. Gov't Ex. A497. Therefore, on November 17, 2004 HUD became the

mortgagee on the February 1, 1995 mortgage. *Id*. Paragraph 19 of the February 1, 1995 mortgage states:

> IN THE EVENT of default in making any monthly payment provided for herein or in the note secured hereby for a period of thirty (30) days after the due date thereof, or in any case of a breach of any other covenant or agreement herein stipulated, then the whole of said principal sum remaining unpaid together with accrued interest thereon, shall, at the election of the Mortgagee, without notice, become immediately due and payable, in which event the Mortgagee shall have the right immediately to foreclose the mortgage.

Gov't Ex. A271 ¶ 19.

At the time of the assignment, Lawndale Restoration had not made a mortgage payment in over four months and was in default. Gov't Ex. A480-91, A496. On March 1, 2005, HUD advised Lawndale Restoration that HUD would foreclose on the February 1, 1995 mortgage. Gov't Ex. A506, A508. On January 17, 2006, the mortgage on the South Side Properties was foreclosed, pursuant to HUD's contractual rights as mortgagee. Gov't Ex. A526. Therefore, the foreclosure was undertaken by HUD "in its proprietary rather than its sovereign capacity." *St. Christopher Assocs.*, 511 F.3d at 1385. As such, any remedies Plaintiff may have "are provided by the contract." *Id*.

As the predecessor to our appellate court held in *Sol-G Construction Corp.* v. *United States*, 231 Ct. Cl. 846 (Ct. Cl. 1982):

> It is clear that when the United States foreclosed its rights as assignee of the mortgages, it was acting in its proprietary capacity . . . . The legal rights which attached as a result of the Government's action were the same as if a commercial financial organization had foreclosed the mortgages after they had been assigned to it. Plaintiff's loss is the kind of consequential injury which results from lawful Government action, and does not entitle it to compensation as a Fifth Amendment taking.

*Id*. at 846.

Accordingly, the court has determined that the Government is entitled to summary judgment with respect to Plaintiff's takings claim. *See* RCFC 12(d), 56(c).

## V. CONCLUSION.

The Government's Motion To Dismiss is granted as to the claim in Count I of the November 19, 2009 Complaint for breach of contract for failure to provide additional funds; and the claim for promissory estoppel in Count III.

The Government's Motion For Summary Judgment is granted as to the claims in Count I of the November 19, 2009 Complaint for breach of contract for failure to allow Plaintiff to

refinance, and breach of the implied duty of good faith and fair dealing; and the claim for taking without just compensation in Count II.

Accordingly, the Clerk of the Court for the United States Court of Federal Claims is directed to enter judgment on behalf of the Government.

**IT IS SO ORDERED.**

<u>s/ Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**